UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOAN JOHNSON,

                                        Plaintiff;


                    -against-


THE CITY OF NEW YORK;                    **FIRST AMENDED**
EMRAH ATES,                              **COMPLAINT**
ANDREW BLAKE,                            **Docket #16 CV 3295**
SOPHIA CARSON,                           **(WFK)(VMS)**
EVANGELOS DIMITRIKAKIS,
FERNANDO GUIMAREAS,
HUGO ORTEGA,
PAUL ORTIZ,
JOEL POLICHRON,
RON REYNOLDS,
CHRISTOPHER THOMAS,

                                        Defendants.


        Plaintiff, Joan Johnson, by her attorneys, Lumer & Neville, hereby alleges

upon information and belief as follows:

### PARTIES, VENUE, and JURISDICTION

        1.      At all times hereinafter mentioned, plaintiff Joan Johnson was

an adult female resident of Kings County, in the State of New York.

        2.      At all relevant times hereinafter mentioned, defendant City of

New York ("New York City"), was and is a municipal corporation duly organized

and existing under and by virtue of the laws of the State of New York and acts

by and through its agencies, employees and agents, including but not limited

to, the New York City Police Department ("NYPD") and its employees.

3.      At all relevant times hereinafter mentioned, defendant Emrah Ates was employed by New York City as a member of the NYPD. Emrah Ates is sued in his individual capacity.

4.      At all relevant times hereinafter mentioned, defendant Andrew Blake was employed by New York City as a member of the NYPD.  Andrew Blake is sued in his individual capacity.

5.      At all relevant times hereinafter mentioned, defendant Sophia Carson was employed by New York City as a member of the NYPD.  Sophia Carson is sued in her individual capacity.

6.      At all relevant times hereinafter mentioned, defendant Evangelos Dimitrikakis was employed by New York City as a member of the NYPD.  Evangelos Dimitrikakis is sued in his individual capacity.

7.      At all relevant times hereinafter mentioned, defendant Fernando Guimareas was employed by New York City as a member of the NYPD.  Fernando Guimareas is sued in his individual capacity.

8.      At all relevant times hereinafter mentioned, defendant Hugo Ortega was employed by New York City as a member of the NYPD.  Hugo Ortega is sued in his individual capacity.

9.      At all relevant times hereinafter mentioned, defendant Paul Ortiz was employed by New York City as a member of the NYPD.  Paul Ortiz is sued in his individual capacity.

10.     At all relevant times hereinafter mentioned, defendant Joel Polichron was employed by New York City as a member of the NYPD.  Joel Polichron is sued in his individual capacity.

11.     At all relevant times hereinafter mentioned, defendant Ron Reynolds was employed by New York City as a member of the NYPD.  Ron Reynolds is sued in his individual capacity.

12.     At all relevant times hereinafter mentioned, defendant Christopher Thomas was employed by New York City as a member of the NYPD.  Christopher Thomas is sued in his individual capacity.

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

14.     Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq., in the Eastern District of New York, where plaintiff and defendant City of New York reside, and where the majority of the actions complained of herein occurred.

15.     A Notice of Claim was timely served by plaintiff upon the defendant City of New York.

16.     The City of New York subsequently conducted an examination of plaintiff pursuant to General Municipal Law §50-H.

17.     At least thirty days have passed since plaintiff's service of her Notice of Claim, and adjustment and payment thereof has been neglected or refused by the City of New York.

18.     Plaintiff has complied with all obligations, requirements, and conditions precedent to commencing an action against New York City under New York law.

## RELEVANT FACTS

19.     As of January 16, 2014, plaintiff resided in an apartment on 23–25 New Lots Avenue in Kings County (the "premises"), along with plaintiff's two daughters, and her less than one-year-old grandson, each of whom, with the exception of plaintiff's grandson, had her own separate bedroom.

20.     On January 16, 2014, at or around four o'clock in the morning, while plaintiff, plaintiff's daughters, and plaintiff's grandson were all asleep, members of the NYPD, either including or acting on behalf of the individual defendants, forcibly entered the premises without warning of any kind and seized and handcuffed plaintiff.

21.     At no point did the individual defendants display or produce a warrant authorizing their entry into the premises, and there was no reasonable basis for defendants to believe that they had consent to enter the premises or that any exigency existed that would justify their entry.

22.     After ordering plaintiff to exit her bedroom, the individual defendants conducted a search of plaintiff's bedroom, which search yielded no drugs, weapons or any other type of contraband.

23.     No drugs, weapons, or contraband of any sort were found anywhere in plaintiff's bedroom or in plain view anywhere in the premises.

4

24.     Despite the absence of probable cause, and approximately one hour after defendants' forcible entry into the premises, plaintiff was taken into defendants' custody, and placed in the back of a police van. Defendants did not arrest plaintiff's daughters who remained in the premises with plaintiff's grandson.

25.     At this time, defendants were still rummaging through plaintiff's bedroom and the rest of the premises, which was left ransacked and some of the furniture damaged as a direct result of defendants' forcible entry into, and search of, the premises.

26.     After putting plaintiff in the back of a police van while plaintiff was still in handcuffs, the individual defendants drove plaintiff around for several hours in what seemed like an attempt to frighten and intimidate plaintiff.

27.     One of the defendants said to plaintiff while en route to a local NYPD station house: "It's your son's fault that we're doing this to you," without further explaining the foregoing statement or the reason plaintiff was handcuffed and arrested.

28.     At around 9:30 A.M., defendants had finally brought plaintiff to a local area precinct where she was allowed to use the bathroom, after which plaintiff was again handcuffed and placed in the same police van by the individual defendants.

29.     While in the police van, plaintiff repeatedly asked defendants to loosen her handcuffs but defendants ignored each such request.

30.     At one point, plaintiff begged the individual defendants to take her to the hospital because she was in a lot of pain and was having respiratory trouble due to injury to her shoulder caused from the tight handcuffs around her wrists and being dragged around for several hours in a moving police vehicle.

31.     At around 11:00 A.M., plaintiff was taken back to that same local precinct.

32.     After spending about half an hour at the precinct, plaintiff was finally released and issued a Desk Appearance Ticket.

33.     The Desk Appearance Ticket issued to plaintiff charged her with one count of criminal possession of a controlled substance in the seventh degree, and one count of criminal use of drug paraphernalia in the second degree. These criminal charges were based solely on false and fabricated statements knowingly made by the individual defendants.

34.     While in defendants' custody, defendant Ortega, with the help and complicity of the other individual defendants, completed arrest paperwork in which he falsely claimed that drugs were recovered during the search of plaintiff's premises.

35.     Plaintiff had not engaged in any unlawful conduct on the day of the arrest, nor were there any drugs or drug paraphernalia in plaintiff's bedroom or the rest of the premises.

36.     The individual defendants were aware at the time of plaintiff's arrest that plaintiff had not committed any unlawful act and that no drugs were recovered from the search of the premises.

37.     The false statements fabricated by defendant Ortega and the other individual defendants regarding the presence of drugs and drug paraphernalia inside the premises were forwarded to the Kings County District Attorney ("KCDA") in order to justify plaintiff's arrest and initiate her criminal prosecution, with the ultimate goal of procuring her conviction for crimes defendants knew plaintiff did not commit.

38.     On July 1, 2015, the KCDA declined plaintiff's prosecution, dismissing all criminal charges against plaintiff.

39.     To the extent that any of the individual defendants did not directly engage or participate in the above-mentioned misconduct and/or fabrication of evidence against plaintiff, at no time did any of these defendants, or any other member of the NYPD, take any steps to intervene in plaintiff's arrest, nor did any of them file any corrective statement or make any effort of any sort to correct the false statements they knew defendant Ortega had fabricated and communicated to the KCDA, or otherwise protect plaintiff from further harm caused by the defendants' knowing violation of plaintiff's constitutional rights.

40.     The individual defendants knew and understood that they lacked sufficient evidence to justify plaintiff's arrest, and notwithstanding such knowledge, they failed to take any steps to intercede in the illegal and unlawful

conduct of fellow NYPD officers, or otherwise inform supervisory officers within the NYPD or members of the KCDA about one or more of the defendants' unlawful actions.

41.     As a direct result of defendants' unlawful seizure, arrest, and detention of plaintiff, plaintiff suffered a serious deprivation of her liberty.

42.     At all times relevant herein, the defendants were acting within the scope of their employment, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.


## FIRST CAUSE OF ACTION

(42 USC §1983 Claims for False Arrest, Malicious Prosecution, and Denial of Fair Trial as to the Individual Defendants)

43.     Plaintiff repeats the above-stated allegations as though stated fully herein.

44.     The individual defendants willfully and intentionally seized, arrested, and caused plaintiff to be detained without probable cause, or any reasonable basis to believe probable cause existed, or otherwise failed to intervene while their fellow officers engaged in this unconstitutional conduct.

45.     The individual defendants fabricated and withheld evidence, and misled the KCDA in order to manufacture probable cause for plaintiff's arrest and subsequent prosecution, or otherwise failed to intercede with the KCDA in order to put a stop to plaintiff's unlawful arrest, detention, and prosecution caused by their fellow officers' unconstitutional conduct.

46.     The individual defendants, individually and collectively, subjected plaintiff to (i) false arrest and unlawful detention, (ii) denial of due process and the right to a fair trial through the fabrication of evidence, and (iii) malicious prosecution, thereby violating, or at least aiding and abetting in the violation of, plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

47.     To the extent that any of the individual defendants did not directly engage in this unconstitutional conduct, each and every such officer was aware of such conduct by his fellow officers, yet consciously failed to make any effort, despite ample time and opportunity to do so, to intervene or otherwise put a stop to the aforementioned misconduct and violation of plaintiff's constitutional rights, by remaining silent or otherwise deliberately choosing not to take any meaningful steps to correct their fellow officers' misconduct.

48.     By reason thereof, the individual defendants have violated 42 U.S.C. § 1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, imprisonment and the deprivation of liberty, as well as the loss of her constitutional rights.

## SECOND CAUSE OF ACTION

(Monell Claim Against the Municipal Defendant)

49.     Plaintiff repeats the preceding allegations as though stated fully herein.

50.     The individual defendants' false arrest and prosecution of plaintiff, as well as their fabrication of evidence against plaintiff to justify their unconstitutional conduct, and their failure to intervene or otherwise act to prevent or mitigate the harms being inflicted by their fellow defendants, were carried out in accordance with an existing plan or policy created or otherwise condoned by the municipal defendant designed to increase the number of arrests made without regard to probable cause.

51.     The purpose of this policy or plan was to generate large numbers of arrests to help the NYPD create a false impression of positive activity by their officers and to satisfy internal quotas.

52.     In addition, members of the NYPD are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members of the NYPD routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

53.     The NYPD tracks the number of arrests made by each officer, but in evaluating its officers, does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result,

officers are well aware that (a) they are being evaluated based on, in large part, the number of arrests made, and (b) their supervisors do not care whether these arrests lead to actual criminal prosecutions, much less convictions.

54.    More precisely, under this policy or plan, officers are encouraged or pressured to make as many arrests as possible, which has caused and will continue to cause, its officers, including the individual defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges. The officer(s) would then fabricate claims of having seen the person(s) being arrested in possession of weapons or illegal narcotics or otherwise engaged in criminal activity.

55.    Upon information, this policy was in existence as of January 16, 2014 as codified in an October 17, 2011, Police Officer Performance Objectives Operation Order in which NYPD Commissioner Kelly directed all commands that, "Department managers can and must set performance goals" relating to the "issuance of summons, the stopping and questioning of suspicious individuals, and the arrests of criminals."

56.    Upon information and belief, that same Operation Order stated, "uniformed members. . . .Who do not demonstrate activities . . . or who fail to engage in proactive activities . . . will be evaluated accordingly and their assignments re-assessed."

57.    In the case of Floyd v City of New York, 813 F. Supp. 2d 417, 448 (S.D.N.Y.) on reconsideration, 813 F. Supp. 2d 457 (S.D.N.Y. 2011), United

States District Judge Shira A. Scheindlin denied the City of New York's motion for summary judgment, in part, based on evidence that the NYPD had a widespread practice of imposing illegal stop and frisk, summons, and arrest quotas on officers. The evidence cited in Floyd, included testimony from various officers, audio recordings of roll call meetings in which precinct commanders issued orders to produce certain numbers of arrests, stops and frisks, and summonses, and a labor grievance on behalf of six officers and one sergeant who were transferred out of the same 75 precinct where plaintiff was arrested for allegedly failing to meet a ten summons-per-month quota. In January 2006, a labor arbitrator found that this same 75 precinct had imposed summons quotas on its officers in violation of New York State labor laws.

58.     In another Southern District of New York case, Schoolcraft v. City of New York, 10 CV 6005 (RWS), the plaintiff, a police officer assigned to Brooklyn's 81 precinct alleged that precinct commanders and supervisory personnel expressly imposed arrest and summons quotas, and explicitly directed officers to "arrest and summons fully innocent people" and then come up with a justification later.

59.     In 2012, Police Officer Craig Matthews commenced Matthews v. City of New York, 12 CV 1354 (BSJ) in the Southern District of New York, alleging that his complaints that the existing quota system was leading to unjustified stops and arrests, and thereby causing damage to the department's relationship with the local community led to his termination. There was little dispute that he made these complaints or that they were well founded. See

Matthews v. City of New York, 779 F.3d 167, 169 (2d Cir. 2015).

60.    That this plan is still in effect is reflected in a class action suit apparently filed in August 2015 by various police officers alleging that the NYPD still requires officers to meet fixed numerical goals for arrests and court summonses each month, according to a New York Times article published February 18, 2016, which can be found online at http://nyti.ms/1R9FCGu.

61.    The policy or plan was kept in effect through the date of plaintiff's arrest, despite the municipal defendant's knowledge that county prosecutors were often not charging the individuals arrested, or otherwise not actively pursuing their prosecution, or that there was insufficient evidence to justify the arrests and illegal searches, or that the arresting officers were seeking to bolster the arrests with false allegations, and that the prosecutors often had found insufficient cause to justify the imposition of charges or continued prosecution if charges were filed.

62.    Indeed, defendant Ortega was himself sued in a case captioned Smith, et al., v. City of New York, et al., 14 CV 5841 (MKB) (VMS), in the Eastern District of New York, in which the three plaintiffs alleged that, in November 2013, Ortega along with other members of the NYPD had obtained a search warrant for their apartment based on fraudulent or deliberately inaccurate information, executed the warrant, and caused the plaintiffs, to be arrested on narcotics charges fabricated, in part, by defendant Ortega. The plaintiffs were detained for one day and the charges were declined, in part, and then dismissed. The defendants caused a child neglect petition to be filed, but

the children were never removed from the home and the petition was dismissed. The City resolved that case by paying the three plaintiffs $180,000. And at least one pending civil rights suit accuses defendant Ortega, among other things, of knowingly planting drugs on plaintiff in order to justify his arrest and prosecution. See Cayemittes v. City of New York et al., 15 CV 2364 (WFK) (RLM).

63.    Neither Ortega, nor any other person involved in the arrest and prosecution of these plaintiffs were disciplined in any way or otherwise held accountable for their conduct.

64.    According to Pacer, other cases in which Hugo Ortega is a named defendant that are or were pending in the Eastern District of New York include, Racks, et al., v. City of New York, et al., 11 CV 2305 (WFK) (RML) (allegations of excessive force, including attempted murder, false arrest, and other misconduct, as well as a Monell claim against the municipal defendant); Hunter v. City of New York, et al., 12 (NG) (RML) (alleging, in part, false arrest, excessive force, and malicious prosecution (settled)); Singleton v. City of New York, et al., 12 CV 4175 (JBW) (LB) (alleging, in part, false arrest and unlawful strip search (settled)); Morris, et al., v. City of New York, et al., 12 CV 6360 (CBA) (JMA) (alleging, in part, false arrest, excessive force, malicious prosecution, and denial of a fair trial).

65.    These cases are but a small, small drop in the ocean of civil rights cases against members of the NYPD and the Narcotics Division in which plaintiffs are claiming that they were falsely arrested and imprisoned or prosecuted based on fabricated evidence.

66.    More generally, according to an article in New York Magazine, dated October 10, 2014, the City of New York issued a report reflecting that it paid an average of $33,875 per case to resolve well over 10,000 cases between 2009 and 2014, and that figure did not take into account filed cases that were still pending when the report was compiled. Similarly, the City Comptroller has reported that the City of New York's payments to resolve allegations of misconduct by members of the NYPD had risen from $99 million to $217 million in between 2005 and 2014, as stated on Page 2 in the Comptroller's August 2015 report at http://nylawyer.nylj.com/adgifs/decisions15/083115claims.pdf. While such numbers relate to the NYPD as a whole, they reflect that the City had actual knowledge that its police department was routinely engaging in unconstitutional and unlawful conduct, at least some of which can be attributed to a quota policy that stressed the need for a specific quantity of arrests, without regard for quality, meaning evidence supporting probable cause for the arrests.

67.    In October 2011, following a bench trial in New York State Supreme Court, Kings County, under indictment number 06314-2008, former NYPD narcotics officer Jason Arbeeny was convicted of planting drugs on two

15

individuals and falsifying arrest reports. Before issuing a verdict of guilty, the

trial judge scolded the NYPD for what he described as a "widespread culture of

corruption endemic in its drug units." The judge further stated that the

testimony demonstrated that the NYPD narcotics divisions maintain a "cowboy

culture" and that he was "shocked, not only by the seeming pervasive scope of

misconduct but even more distressingly by the seeming casualness by which

such conduct is employed."

68.     In an Order dated November 25, 2009, in Colon v. City of New

York, 09- CV-0008 (E.D.N.Y.), the Hon. Jack B. Weinstein stated:

> "Informal inquiry by the court and among the judges of
> this court, as well as knowledge of cases in other
> federal and state courts, has revealed anecdotal
> evidence of repeated, widespread falsification by
> arresting police officers of the New York City Police
> Department. Despite numerous inquiries by
> commissions and strong reported efforts by the
> present administration -- through selection of
> candidates for the police force stressing academic and
> other qualifications, serious training to avoid
> constitutional violations, and strong disciplinary
> action within the department -- there is some evidence
> of an attitude among officers that is sufficiently
> widespread to constitute a custom or policy by the city
> approving illegal conduct of the kind now charged."

69.     It is thus manifestly clear through the litigation brought in the

Eastern and Southern Districts of New York, as well as the many cases filed in

New York State courts, that thousands of civilians have alleged that members

of the NYPD have deliberately arrested them without probable cause. Thus,

even if the municipal defendant was not the architect of the policies and

routinized conduct causing these unlawful arrests, the City was certainly on

16

notice of the practice, and by failing to take any meaningful corrective steps, has ratified, endorsed, or otherwise communicated its acceptance of this policy to the officers it continues to employ.

70.     Rather than take meaningful steps to reduce and eliminate such misconduct by its officers, the City of New York and the NYPD have instead affirmatively announced a renewed commitment to defending such misconduct. In an article in the New York Times on February 4, 2016, the link to which is http://nyti.ms/1nPv0mO, the City proudly announced that the NYPD had "created a new 40-member legal unit that develops evidence that the Law Department can use to defend lawsuits against the police, and the [Law Department] hired about 30 lawyers to bolster its litigation teams and to try more cases in court." According to this article, these steps were warmly received by police union leaders.

71.     The City's stated response to the wave of litigation caused by misconduct on the part of the NYPD is thus directed not at the deliberate and frequent constitutional violations underlying the consequential litigation, but rather at defending such misconduct so that officers can continue to engage in unconstitutional conduct without fear of being sued or held accountable. In so doing, the City has dispensed altogether with any pretense that such misconduct is not sanctioned, ratified, or otherwise endorsed by the City of New York and the NYPD's executive leaders and supervisory personnel.

72.     It is therefore clear that the municipal defendant has not only tolerated, but actively fostered a lawless atmosphere within the NYPD and that

17

the City of New York, at a bare minimum, has been on notice yet was deliberately indifferent to the risk that the undue emphasis on arrest quotas, or minimum activity levels, particularly when coupled with a deliberately indifferent level of supervision, would lead to the violation of individuals' constitutional rights in general, and cause the violation of plaintiff's rights in particular.

73.    By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of her constitutional rights.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

WHEREFORE, plaintiff demands judgment against defendants jointly and severally as follows:

i.    Actual and punitive damages against each of the individual defendants in an amount to be determined at trial;

ii.    Actual damages against the municipal defendant in an amount to be determined at trial;

iii.    Statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, disbursements, and costs of the action; and

iv.    Such other relief as the Court deems just and proper.

Dated:  New York, New York
        January 12, 2017

                              Respectfully submitted,

                              James Concemore Neville, Esq.
                              LUMER & NEVILLE
                              *Attorneys for Plaintiff*
                              225 Broadway, Suite 2700
                              New York, New York 10007
                              (212) 566-5060

                                            /s/
                              By: _____
                                    James C. Neville, Esq.